LEVERTY & ASSOCIATES LAW CHTD.
PATRICK R. LEVERTY
832 Willow St.
Reno, Nevada 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
600 B Street, Suite 1900
San Diego, CA  92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| JOHN. ZAREMBA, Derivatively on Behalf of LAS VEGAS SANDS CORP., <br><br>     Plaintiff, <br><br>   vs. <br><br> SHELDON G. ADELSON, MICHAEL A. LEVEN, IRWIN A. SIEGEL, JEFFREY H. SCHWARTZ, JASON N. ADER, CHARLES D. FORMAN, IRWIN CHAFETZ, GEORGE P. KOO, and WING T. CHAO, <br><br>     Defendants, <br><br>   and <br><br> LAS VEGAS SANDS CORP., a Nevada corporation, <br><br>     Nominal Defendant. | Case No. <br><br> Dept. No. <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought on behalf of nominal defendant Las Vegas Sands Corp. ("LVSC" or the "Company") against its board of directors (the "Board"), and certain officers.  This action seeks to remedy defendants' violations of law, including breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, which have caused and continue to cause substantial damage to the Company.

2.      LVSC develops multi-integrated resorts throughout the world including in Nevada, Pennsylvania, Singapore, and Macau – a special administrative region of the People's Republic of China ("PRC").  Its developments include The Venetian Resort Hotel Casino, The Palazzo Resort Hotel Casino, and The Sands Expo and Convention Center located in Las Vegas, Nevada and Marina Bay Sands in Singapore.  In addition, through its majority-owned subsidiary, Sands China Limited ("SCL"), the Company owns several destination properties in Macau, including The Venetian Macao Resort Hotel, Sands Macao Hotel, Four Seasons Hotel Macao, and The Four Seasons Apartments located in the Cotai Strip in Macau.

3.      Because the Company has a global presence and significant international development and operations, the Company must comply with the Foreign Corrupt Practices Act ("FCPA").  Under the FCPA, it is unlawful for companies such as LVSC to make improper payments to foreign officials to obtain or retain business.  In addition, the FCPA requires that companies establish and maintain adequate internal controls to prevent such bribes and kickbacks from occurring.  Non-compliance with the FCPA may result in fines, sanctions, and other adverse actions, including exposing the Company to civil liability.  As defendants admitted in the Company's most recent Form 10-K, "[a]ny violation of the [FCPA] … could have a negative impact on [the Company]."

4.      In addition, as a Company incorporated and headquartered in Nevada, LVSC is subject to Nevada gaming regulations.  Under such regulations, the Company is expressly prohibited from engaging in any activity or entering into any "unsuitable" associations that reflect or tend to reflect discredit or disrepute upon the State of Nevada or gaming in Nevada, or is contrary to Nevada gaming policies.  This regulation was enacted by the state to rid Las Vegas of the influences of organized crime.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5.      Since its inception in 1988, Sheldon G. Adelson ("Adelson"), LVSC's current Chief Executive Officer ("CEO"), Chairman of the Board ("Chairman"), and controlling shareholder, has firmly controlled and essentially exercised personal autonomy over the operations and management of the Company.   In these roles, defendant Adelson possesses unyielding influence over the Company's Board membership and executive appointments, and their respective remunerations.   As defendants readily admit in the Company's Form 10-K filed March 1, 2011, defendant Adelson "exercises significant influence over [LVSC's] business policies and affairs, including the composition of [the] Board of Directors and any action requiring the approval of [the Company's] stockholders, including the adoption of amendments to [the Company's] articles of incorporation and the approval of a merger or sale of substantially all of [its] assets."

6.      Defendant Adelson's power and influence over the Company, executives, and the Board was demonstrated when he dismissed and forced the resignation of two top executives of LVSC and SCL in the last three years for objecting to his management of the Company.   In March of 2009, defendant Adelson unilaterally forced the resignation of William P. Weidner ("Weidner"), the then President and Chief Operating Officer ("COO") of LVSC who had been with the Company for over fourteen years, without even holding a full meeting and discussion of the Board members in advance.   Soon after, Steven C. Jacobs ("Jacobs"), the then CEO of SCL, was dismissed for objecting and refusing to comply with defendant Adelson's demands to engage in illicit business practices that would have violated the FCPA.   Ultimately, defendant Adelson's abrupt and unwarranted termination of Jacobs, and the ensuing litigation to follow, would expose the defendants' pervasive breach of fiduciary duties to the Company and blatant violations of the FCPA and the Nevada gaming regulations.

7.      Despite the importance of the Company's compliance with the FCPA and the Nevada gaming regulations to its operations, defendants knowingly, recklessly, or with gross negligence caused the Company to violate its provisions.   In particular, defendant Adelson directly instructed Jacobs and the Company to: (i) use "improper leverage" against senior Macau government officials

- 2 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

in order to obtain a concession from the Macau government to sell strata-title[1] to The Four Seasons Apartments; (ii) improperly induce Chinese banks to influence senior Macau government officials into allowing the Company to conduct strata-title sales of The Four Seasons Apartments and to give favorable concessions with respect to labor quotas and table limits for its resorts by threatening to withhold LVSC business; (iii) conduct secret investigations of senior Macau government officials in order to uncover information that it could use to "thwart government regulations/initiatives … adverse to LVSC's interests"; (iv) retain the services of Leonel Alves ("Alves") (a local Macau attorney and member of Macau's Legislative Assembly and the Macau Executive Council), despite potential FCPA issues arising from his employment, and negotiations thereof; and (v) refrain from disclosing material information to SCL's Board including the Company's involvement with the junket business led by members of Chinese organized crime.[2]  When confronted by Jacobs's resistance to acquiesce to his imprudent and unlawful demands, defendant Adelson responded that "he was Chairman of the Board and the controlling shareholder of [SCL] and would 'do as [he] please.'"  After Jacobs' abrupt dismissal, SCL hired Alves as its Legal Advisor despite the apparent FCPA issues arising from his position in the Macau government.  Defendant Adelson's "repeated and outrageous" demands, and Jacobs' firing when he refused to submit to defendant Adelson's unlawful directives,  were merely one example of defendant Adelson's utter disregard for the applicable laws, and unabridged control over the Board and the Company's operations.

8.      In addition, the other Individual Defendants (as defined herein) were complicit in the illicit scheme to use "improper leverage" and other means to obtain favorable political concessions for the Company.  The Individual Defendants failed to implement and/or maintain adequate internal controls to prevent violations of the FCPA and state gaming regulations.  Rather than providing oversight over defendant Adelson's operation of the Company, the Individual Defendants that

---

[1] Strata-title ownership involves dividing a building's ownership to different parties, or a system of ownership of space (e.g., apartments, rooms, etc.) in multi-story buildings.

[2] A junket is a group of individuals formed for the purpose of gambling.  A junket is led by an operator who directs it to certain casinos and are afforded certain benefits and complements courtesy of the operator.  In exchange, the junket operator ordinarily receives from the casino a cut of the junket gamblers' turnover.

1   comprised the Board allowed the Chairman unfettered control over the affairs of LVSC and its

2   subsidiaries.  The Company's negotiation and execution of a facially improper agreement with a

3   reknown government official while government concessions were pending serves as a prime example

4   of the Individual Defendants' failure to maintain proper internal controls.  Notwithstanding potential

5   violations of the FCPA apparent in Alves's eventual hiring, the Individual Defendants acquiesced to

6   the whims of defendant Adelson and rubberstamped Alves's employment as LVSC's Legal Advisor.

7   Further, the Individual Defendants knowingly or recklessly allowed the Company to associate with

8   notorious Chinese organized crime figures through its junket business in direct contravention of the

9   Nevada gaming regulations.  The Individual Defendants failure to implement and maintain sufficient

10  internal controls to deter the Company from forging ties with "unsuitable" organizations have

11  jeopardized LVSC's operations in Nevada.

12          9.      Adelson's attempt to improperly manipulate and induce the Macau government's

13  cooperation with his business agenda for the Company was revealed to the public for the first time

14  when Jacobs filed a complaint in Nevada disputing the terms of his dismissal and exposing

15  defendants' series of FCPA violations, and breach of applicable state laws (the "Jacobs Complaint").

16   In his complaint, Jacobs alleged that he was dismissed from his post as CEO of SCL for objecting to

17  defendant Adelson's demands to engage in conduct that would have violated the FCPA and state

18  gaming regulations.

19          10.     Federal and State agencies would soon take notice of these rampant violations of

20  laws, rules, and regulations.  On March 1, 2011, LVSC disclosed that the U.S. Securities and

21  Exchange Commission ("SEC") and the U.S. Department of Justice ("DOJ") were investigating the

22  Company's compliance with (or lack thereof) the FCPA.  LVSC disclosed that it received a subpoena

23  from the SEC on February 9, 2011, requesting documents relating to its compliance with the FCPA.

24  Further, the Company was informed that the DOJ was conducting a similar investigation.  In its

25  filing, defendant Adelson acknowledged that he believed the government investigations "emanated"

26  from allegations made in the Jacobs Complaint.  The Company now faces serious damages,

27  including fines, penalties, and adverse changes to its business practices and compliance programs as

28  a result of the SEC and DOJ investigations.  As the Individual Defendants admitted, "[a]ny

- 4 -

determination that [the Company has] violated the FCPA could have a material adverse effect on [its] financial condition."

11.     The SEC and the DOJ are not the only agencies scrutinizing the Company's business operations in Macau.  Recently, the Nevada Gaming Control Board ("NGCB") and the Federal Bureau of Investigation ("FBI") have also initiated an investigation into the matters addressed in the Jacobs Complaint, including the Company's ties to the Chinese mafia that would potentially run afoul of Nevada gaming regulations.

12.     As a result of the Individual Defendants' breaches of fiduciary duty, the Company now faces significant liability for violations of the FCPA and state regulations.  The FCPA grants federal authorities the power to impose a broad range of civil and criminal sanctions.  Thus, it is likely LVSC will be subject to future sanctions and fines, and may expend a great deal more resources and monies to address any adverse findings against it.  A violation of the Nevada gaming regulations may cost the LVSC its gaming license.  In addition, the Company is mired in a multi-million dollar lawsuit instituted by its former executive alleging breach of contract.  Finally, the Company has not disclosed how much its internal review and cooperation with regulators has cost thus far.  However, given the egregious nature of the charges, the Company's purported intent to cooperate with the SEC and DOJ investigations, and the additional probe initiated by the NGCB and FBI, it is likely that the ultimate cost to the Company will run in the millions of dollars.

13.     Plaintiff, on behalf of LVSC, seeks to recover for LVSC the damages caused to the Company by the Individual Defendants.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) LVSC maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to LVSC occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

17.     Plaintiff John Zaremba was a shareholder of LVSC at the time of the wrongs complained, has continuously been a shareholder since that time, and is a current LVSC shareholder. Plaintiff Zaremba is a citizen of Illinois.

18.     Nominal defendant LVSC is a Nevada corporation with its principle executive offices located in Clark County, Nevada.  LVSC, with its subsidiaries, develops multi-integrated resorts throughout the world.  LVSC operates resorts in Nevada, Pennsylvania, Macau, and Singapore. LVSC is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.

19.     Defendant Adelson is LVSC's Chairman, CEO, Treasurer, and a director and has been since August 2004.  Adelson is also Chairman, CEO, and a director of Las Vegas Sands, LLC, a subsidiary of LVSC, and has been since April 1988 and Chairman and a director of SCL, a subsidiary of LVSC, and has been since August 2009.  Defendant Adelson is a member of LVSC's Nominating and Governance Committee and has been since at least April 2008.  Defendant Adelson purposefully directed the Company to violate the FCPA and state gaming regulations by encouraging LVSC employees to improperly induce senior Macau governmental officials and aggressively grow

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   the Company's junket business in order to obtain favorable business results for the Company.

2   Defendant Adelson failed to implement and maintain adequate internal controls with respect to the

3   Company's compliance with the FCPA and applicable state regulations.  LVSC paid defendant

4   Adelson the following compensation as an executive and director:

| Year | Salary | Stock Awards | Option Awards | All Other Compensation |
|------|--------|--------------|---------------|------------------------|
| 2009 | $1,000,000 | $24,625 | $1,825,000 | $2,725,524 |

7   Defendant Adelson is a citizen of Nevada.

8          20.      Defendant Michael A. Leven ("Leven") is LVSC's President and COO and has been

9   since March 2009 and a director and has been since August 2004.  Defendant Leven is also SCL's

10  Acting CEO and has been since July 2010.  Defendant Leven was Special Adviser to SCL's Board

11  from October 2009 to July 2010 and a director of Las Vegas Sands, Inc., the predecessor of Las

12  Vegas Sands, LLC, from May 2004 to July 2005. Defendant Leven knowingly or recklessly allowed

13  LVSC to violate the FCPA by authorizing the Company to improperly induce Macau officials to

14  obtain favorable business results for the Company.  Further, defendant Leven failed to implement

15  and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA

16  and applicable state regulations.  LVSC paid defendant Leven the following compensation as an

17  executive and director:

| Year | Salary | Bonus | Option Awards | All Other Compensation |
|------|--------|-------|---------------|------------------------|
| 2009 | $1,561,539 | $202,740 | $2,400,000 | $229,454 |

20  Defendant Leven is a citizen of Nevada.

21         21.      Defendant Irwin A. Siegel ("Siegel") is an LVSC director and has been since February

22  2005.  Defendant Siegel is also an SCL director and has been since October 2009.  Defendant Siegel

23  was a director of Las Vegas Sands, Inc., the predecessor of Las Vegas Sands, LLC, from February

24  2005 to July 2005.  Defendant Siegel is also Chairman of LVSC's Audit Committee and has been

25  since at least April 2008.  Defendant Siegel knowingly or recklessly allowed LVSC to violate the

26  FCPA by authorizing the Company to improperly induce Macau officials to obtain favorable

27  business results for the Company, and failed to implement and/or maintain adequate internal controls

28  with respect to the Company's compliance with the FCPA and applicable state regulations.  Further

in violation of his Audit Committee duties, defendant Siegel knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements. LVSC paid defendant Siegel the following compensation as a director:

| Defendant | Year | Fees Paid In Cash | Stock Awards | Total |
|---|---|---|---|---|
| Siegel, Irwin A. | 2009 | $106,526 | $50,000 | $156,526 |

Defendant Siegel is a citizen of Georgia.

22.     Defendant Jeffrey H. Schwartz ("Schwartz") is an LVSC director and has been since March 2009. Defendant Schwartz is also an SCL director and has been since October 2009. Defendant Schwartz is a member of LVSC's Audit Committee and has been since March 2009. Defendant Schwartz knowingly or recklessly allowed LVSC to violate the FCPA by authorizing the Company to improperly induce Macau officials to obtain favorable business results for the Company, and failed to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA and applicable state regulations. Further in violation of his Audit Committee duties, defendant Schwartz knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements. LVSC paid defendant Schwartz the following compensation as a director:

| Year | Fees Paid In Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2009 | $54,389 | $50,000 | $100,000 | $204,389 |

Defendant Schwartz is a citizen of Nevada.

23.     Defendant Jason N. Ader ("Ader") is an LVSC director and has been since April 2009. Defendant Ader is also a member of LVSC's Audit Committee and has been since April 2009. Defendant Ader knowingly or recklessly allowed LVSC to violate the FCPA by authorizing the Company to improperly induce Macau officials to obtain favorable business results for the Company, and failed to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA and applicable state regulations. Further in violation of his audit committee duties, defendant Ader knowingly or recklessly failed to oversee the Company's

compliance with applicable legal and regulatory requirements. LVSC paid defendant Ader the following compensation as a director:

| Year | Fees Paid In Cash | Stock Awards | Option Awards | Total |
|------|-------------------|--------------|---------------|-------|
| 2009 | $50,517 | $50,000 | $100,000 | $200,517 |

Defendant Ader is a citizen of New York.

24.     Defendant Charles D. Forman ("Forman") is an LVSC director and has been since August 2004. Defendant Forman is also a director of Las Vegas Sands, LLC, a subsidiary of LVSC, and has been since March 2004.  Defendant Forman knowingly or recklessly allowed LVSC to violate the FCPA by authorizing the Company to improperly induce Macau officials to obtain favorable business results for the Company.  Further, defendant Forman failed to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA and applicable state regulations.  LVSC paid defendant Forman the following compensation as a director:

| Year | Fees Paid In Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2009 | $75,000 | $50,000 | $125,000 |

Defendant Forman is a citizen of Massachusetts.

25.     Defendant Irwin Chafetz ("Chafetz") is an LVSC director and has been since March 2005. Defendant Chafetz was also a director of Las Vegas Sands, Inc., the predecessor of Las Vegas Sands, LLC, from March 2005 to July 2005.  Defendant Chafetz knowingly or recklessly allowed LVSC to violate the FCPA by authorizing the Company to improperly induce Macau officials to obtain favorable business results for the Company.  Further, defendant Chafetz failed to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA and applicable state regulations.  LVSC paid defendant Chafetz the following compensation as a director:

| Year | Fees Paid In Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2009 | $83,776 | $50,000 | $133,776 |

Defendant Chafetz is a citizen of Massachusetts.

26.     Defendant George P. Koo ("Koo") is an LVSC director and has been since April 2008.  Defendant Koo knowingly or recklessly allowed LVSC to violate the FCPA by authorizing the Company to improperly induce Macau officials to obtain favorable business results for the Company.  Further, defendant Koo failed to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA and applicable state regulations.  LVSC paid defendant Koo the following compensation as a director:

| Year | Fees Paid In Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2009 | $66,000 | $50,000 | $116,000 |

Defendant Koo is a citizen of California.

27.     Defendant Wing T. Chao ("Chao") was an LVSC director from July 2010 to November 2010.  In November 2010, defendant Chao entered into a consulting agreement with LVSC, pursuant to which he will advise the Company on its design and development projects. Defendant Chao knowingly or recklessly allowed LVSC to violate the FCPA by authorizing the Company to improperly induce Macau officials to obtain favorable business results for the Company.  Further, defendant Chao failed to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA and applicable state regulations.  Defendant Chao is a citizen of California.

28.     The defendants identified in ¶¶19-21 are referred to herein as the "Audit Committee Defendants."   Collectively, the defendants identified in ¶¶17-25 are referred to herein as the "Individual Defendants."

### DUTIES OF LVSC'S DIRECTORS AND OFFICERS

**Fiduciary Duties**

29.     By reason of their positions as officers, directors, and/or fiduciaries of LVSC and because of their ability to control the business and corporate affairs of LVSC, the Individual Defendants owed LVSC fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage LVSC in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best

- 10 -

1  interests of LVSC so as to benefit all shareholders equally and not in furtherance of their personal

2  interest or benefit.

3        30.     Each officer and director of the Company owes to LVSC the fiduciary duty to

4  exercise good faith and diligence in the administration of the affairs of the Company and in the use

5  and preservation of its property and assets, and the highest obligations of fair dealing.

6  **Code of Business Conduct**

7        31.     Starting in 2005, the Company adopted its Code of Business Conduct and Ethics (the

8  "Code").  The Code is applicable to the Company's "directors, officers, including the principal

9  executive officer, principal financial officers, principal accounting officer, employees, and agents,"

10  (collectively referenced as Covered Persons).  According to the Code, its purpose is to "maintain

11  high business ethics and standards."  In particular, the Code mandates that all Covered Persons

12  comply with "both the letter and spirit of all laws, rules, and regulations applicable to the Company's

13  business."  Specifically, the Code directs all Covered Persons to "comply strictly with the [FCPA]."

14  Under the Code, Covered Persons must follow "[c]ompany procedures for carrying out and reporting

15  business transactions" in compliance with the internal accounting control and record-keeping

16  requirements of the FCPA.  Finally, the Code requires that "[e]ach Covered Persons, wherever

17  located, is responsible for conducting his or her business activities in compliance with the Code and

18  the laws of the foreign country in which he or she works."

19  **Specific Audit Committee Duties**

20        32.     In addition to their general duties, defendants Ader, Schwartz, and Siegel owe and/or

21  owed specific duties as members of the Audit Committee, under the Audit Committee's Charter, to

22  LVSC.  In particular, under the Audit Committee Charter in effect since April 2006, and amended in

23  April 2008, these Audit Committee Defendants were responsible for overseeing the Company's

24  compliance with legal and regulatory requirements.  The Audit Committee Defendants were also

25  required to review "the adequacy of the Company's internal controls and its procedures designed to

26  ensure compliance with laws and regulations and any special audit steps adopted in light of material

27  control deficiencies."  Finally, the Audit Committee Defendants were tasked with the general duty to

28  "review with management and the independent registered public accounting firm any reports or

- 11 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

disclosures submitted by management to the Audit Committee, … including management's assessment of the effectiveness of the Company's internal control over financial reporting[.]" The Audit Committee met eight times during 2008, and five times during 2009.

**Control, Access, and Authority**

33.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of LVSC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

34.     Because of their advisory, executive, managerial, and directorial positions with LVSC, each of the Individual Defendants had access to adverse, non-public information about the financial condition and operations of LVSC.

35.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of LVSC, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

36.     To discharge their duties, the officers and directors of LVSC were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of LVSC were required to, among other things:

a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority;

b.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business legally possible;

c.     remain informed as to how LVSC conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices; and

d.     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Breach of Duties**

37.    Each Individual Defendant, by virtue of his position as a officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of LVSC, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of LVSC's Board.

38.    The Individual Defendants breached their duties of loyalty and good faith by operating LVSC without implementing and maintaining internal controls in compliance with the FCPA and applicable state regulations.  These improper inducements and underhanded practices with the aim to influence foreign officials were facilitated by the Individual Defendants conducting LVSC's business in countries with a higher risk of corruption, like Macau, without establishing a system of internal controls to ensure compliance with the FCPA and applicable state regulations.  As a result, LVSC has expended, and will continue to expend, significant sums of its capital, both reputational and economic, addressing the misconduct alleged herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Individual Defendants caused the Company to systematically violate applicable federal and state

laws; (ii) deceive the investing public, including shareholders of LVSC, regarding the Individual Defendants' management of LVSC's operations; and (iii) enhance the Individual Defendants' executive and directorial positions at LVSC and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

41.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to violate the FCPA and state gaming regulations.

42.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

43.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly violate applicable federal and state laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

**FACTUAL ALLEGATIONS**

45.     LVSC is engaged in the business of developing multi-integrated resorts and properties in destinations around the world. In particular, LVSC, through its majority-owned subsidiary SCL, owns and operates several properties in Macau, including Sands Macao, The Venetian Macao, and The Four Seasons Macao. LVSC "spun-off" SCL in November 2009, through a $2.5 billion initial public offering on the Hong Kong Stock Exchange. As of December 31, 2010, LVSC owns 70.3%

of the issued and outstanding ordinary shares of SCL.  Among other properties in Macau, SCL directly owns The Venetian Macao, the Sands Macao, and the Plaza Macao.

46.     First opened in August 2008, The Four Seasons Macao currently consists of The Four Seasons Hotel Macao.  However, according to the Company, The Four Seasons Macao will soon feature The Four Seasons Apartments Macao, Cotai Strip, which consists of The Four Seasons serviced and branded luxury apartments.  In all, LVSC's Macau operations account for approximately 61.5% of the Company's total net revenue, or $4.2 billion.  LVSC's (as well as other companies') business operations in Macau are perceived as presenting a higher than normal risk of corruption, where, for example, improper payments in exchange for gaming concessions are not discouraged.

### A.    FCPA Requirements and Nevada Gaming Regulations

47.     LVSC stock is traded on the New York Stock Exchange under the symbol "LVS."  As an issuer of U.S. registered securities, LVSC is subject to the provisions of the FCPA.

48.     The FCPA, first enacted in 1977, made it unlawful for U.S. issuers of registered securities (i.e., corporations), or any person acting at their behest, to make improper payments to any foreign official in order to obtain or retain business. 15 U.S.C. §78dd-l.  In addition, the FCPA established accounting control requirements for issuers subject to either the registration or reporting provisions of the Securities Exchange Act of 1934 (the "Exchange Act"). 15 U.S.C. §78m.  In particular, the FCPA requires every issuer with a class of securities registered pursuant to Section 12 of the Exchange Act to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

49.     Because LVSC is incorporated and headquartered in Nevada, it must also comply with the gaming laws of that state, which prohibits "unsuitable" associations that "reflect or tend to reflect discredit [or disrepute] upon the State of Nevada or the gaming industry."  In particular, the Nevada gaming regulations are as follows, in pertinent parts:

**5.011 Grounds for disciplinary action.** The board and the commission deem any activity on the part of any licensee, his agents or employees, that is inimical to the public health, safety, morals, good order and general welfare of the people of the State of Nevada, ***or that would reflect or tend to reflect discredit upon the State of Nevada or the gaming industry***, to be an unsuitable method of operation and shall be grounds for disciplinary action by the board and the commission in accordance with

- 15 -

the Nevada Gaming Control Act and the regulations of the board and the commission. Without limiting the generality of the foregoing, the following acts or omissions may be determined to be unsuitable methods of operation …

10. Failure to conduct gaming operations in accordance with proper standards of custom, decorum and decency, or permit any type of conduct in the gaming establishment *which reflects or tends to reflect on the repute of the State of Nevada and act as a detriment to the gaming industry*.

## B.      LVSC's Penetration of Macau's Gaming Industry

50.      Since Macau's return to Chinese rule in December 1999, its immensely profitable gambling industry has opened its doors to domestic and foreign entities seeking to develop casino resorts.  In fact, in 2006, gambling revenue in Macau surpassed that of Las Vegas, and in 2010, Macau's gaming revenue quadrupled that of Las Vegas.  However, Macau has been plagued by political corruption and the influence of organized crime.  For example, in January 2008, Ao Man Long, Macau's Secretary for Transport and Public Works, was convicted of taking more than $100 million in bribes, laundering money, and abusing his power to help property developers win lucrative government construction deals and contracts linked to casino construction.

51.      Further, Macau casinos, including those owned by SCL, have been linked to Chinese organized crime that have used casino property to run their loan-sharking, junket, and prostitution operations.  On March 29, 2010, Reuters published an article about a murder-for-hire plot involving Cheung Chi-tai ("Cheung"), a leader of the "Triads," which detailed LVSC's ties to organized crime.  As an unidentified gaming official in the Reuters article was quoted, "This relationship (with Cheung) would be of concern to Nevada authorities. You're talking about direct ties to bad guys."  In particular, the article stated:

The murder-for-hire case sheds light on the links between China's secretive triad societies and Macau's booming gambling industry. It also raises potentially troubling questions about one of the world's largest gaming companies, Las Vegas Sands, which plans to open a $5.5 billion Singapore casino resort in late April.

Cheung was not just named as a triad member but also, according to a regular casino patron testifying in the trial, *"the person in charge" of one of the VIP rooms at the Sands Macau*, the first of three casinos run here by Las Vegas Sands. In addition, Cheung has been a major investor in the Neptune Group, a publicly traded company involved in casino junkets -- the middlemen who bring wealthy clients to Macau's

gambling halls. Documents show that his investment allowed him a share in the profits from a VIP gambling room at the casino.

An examination of Hong Kong court records, U.S. depositions from the former president of Sands, and interviews with law enforcement and security officials in both the U.S. and Macau, reveals *a connection between Las Vegas Sands and Cheung* -- ties that could potentially put Sands in violation of Nevada gaming laws.

52.     LVSC, first entered Macau in 2002 through a joint venture with a Hong Kong based corporation, Galaxy Entertainment Group ("Galaxy").  The joint venture was awarded gambling concessions by the Macau government, making LVSC the first American operator to open a casino on Chinese soil.  LVSC's victory however, was marred by allegations of corruption and violations of the FCPA.  In fact, soon after winning the concession bidding, three separate civil suits were filed against the Company alleging that the Company had failed to pay the plaintiffs' contracted fees for brokering the joint venture between LVSC and Galaxy, and assisting in winning the Macau gambling concessions.  Evidence from the litigations revealed potential improprieties in the nature of the bidding process for the gambling concessions.   To start, testimony by the Company's former President and COO, Weidner, revealed that the joint venture was actually orchestrated by the Macau government merely days before the gambling concessions were awarded in order "to put a Chinese face on [the] license."  Moreover, when the joint venture proved unsustainable due to irreconcilable differences between LVSC and Galaxy after the concessions had already been awarded, in an unprecedented move, Macau officials changed its gambling policy to allow LVSC to open its own casino resort independent of Galaxy.  Due to the questions surrounding potential improprieties concerning the Macau government's awarding of the gambling concessions to the Company, LVSC was concerned that the pending litigations would reveal violations of the FCPA during the bidding process.  In fact, LVSC retained outside legal counsel specializing in FCPA issues to prepare a defense in case the SEC or DOJ were to investigate the 2002 concession bidding.  Ultimately, LVSC was not investigated for misconduct at that time and the foregoing civil litigation was settled prior to trial in 2009.  LVSC has since opened three casino resorts in Macau through SCL, and is currently developing luxury apartments serviced and branded by The Four Seasons – The Four Seasons Apartments.

53.    The Company's ability to sell The Four Seasons Apartments as condos has been a point of heavy contention between LVSC and the Macau government.  This is because the Company's concession to the property where The Four Seasons Apartment is currently being developed, the Cotai Strip site, is restricted solely for gaming and hospitality projects.  As such, strata-title (condo) sales of The Four Seasons Apartments are prohibited under the land lease agreement.  LVSC has lobbied the Macau government to authorize strata-title sales of its apartments on the Cotai Strip site, which has yet to be granted.

**C.    Defendant Adelson's Dominion and Control Over LVSC**

54.    Defendant Adelson, as controlling shareholder, CEO, and Chairman, dictates the affairs and operations of LVSC.  As of February 18, 2011, defendant Adelson controlled approximately 46.2% percent of the voting power of its common stock.  In fact, every Form 10-K filed by the Company since its initial public offering ("IPO") in 2004 explicitly acknowledges defendant Adelson's dominion and control over the operations and affairs of the Company, describing his considerable influence over the make-up of the Board, stating:

> ***The interests of our principal stockholder in our business may be different from yours.***
>
> Mr. Adelson, his family members and trusts established for the benefit of Mr. Adelson and/or his family members beneficially own (excluding unexercised warrants to purchase 87.5 million shares of our common stock) approximately 49% of our outstanding common stock as of December 31, 2010. Accordingly, ***Mr. Adelson exercises significant influence over our business policies and affairs, including the composition of our Board of Directors and any action requiring the approval of our stockholders***, including the adoption of amendments to our articles of incorporation and the approval of a merger or sale of substantially all of our assets. ***The concentration of ownership may also delay, defer or even prevent a change in control of our company and may make some transactions more difficult or impossible without the support of Mr. Adelson***.  The interests of Mr. Adelson may conflict with your interests.

55.    The Board has continuously and unwaveringly submitted to the wishes of defendant Adelson, and extended defendant Adelson and his family members every privilege at the expense of the Company.  For instance, the Company and its predecessor entities have employed defendant Adelson's wife, Dr. Miriam Adelson ("Dr. Adelson"), as Director of Community Involvement since

- 18 -

1  August 1990 and paid her a salary of $50,405 and $50,000, in 2008 and 2009, respectively.  In

2  addition, defendant Adelson's stepdaughter has been employed by the Company as his Special

3  Assistant since at least 2007, during which time she received a salary of $98,100, $103,000, and

4  $85,500, in 2007, 2008, and 2009, respectively.

5        56.     The Company has also afforded defendant Adelson and his family members security

6  and transportation at considerable expense to LVSC.  The Company incurred a cost of approximately

7  $2.5 million to provide security for defendant Adelson and his immediate family.  Further, the

8  Company paid $128,774, $173,291, and $163,812, in 2007, 2008, and 2009, respectively, for an

9  automobile and driver for defendant Adelson.  And from at least 2007 to 2009, LVSC reimbursed

10 defendant Adelson $100,000 in unidentified "professional fees."

11       57.     LVSC has also engaged in lucrative transactions with entities owned and/or operated

12 by defendant Adelson and his family members.  For instance, the Company purchased certain

13 products from defendant Adelson's brother's Company, Deluxe Hotels Supply, LLC, at a cost to the

14 Company of $1.8 million, $1.2 million, and $1.0 million, in 2005, 2006, and 2007, respectively.  In

15 addition, LVSC entered into several aircraft time-sharing agreements with Interface Operations, LLC

16 ("Interface Operations"), a Company controlled by defendant Adelson, for use of certain aircrafts

17 owned by the entity.  Pursuant to the time-sharing agreements, the Company paid Interface

18 Operations $5.8 million in 2008, and $7.3 million in 2009.

19       58.     Recently, Dr. Adelson has made significant investments in the Company, and

20 accordingly received substantial interest payments and dividends from her holdings.  In September

21 2008, the Company sold $475 million in aggregate principal amount of its 6.5% convertible senior

22 notes due 2013 in a private transaction to Dr. Adelson.  Thereafter, on November 14, 2008, Dr.

23 Adelson converted the $475 million aggregate principal amount of the convertible notes into shares

24 of common stock at a conversion price of $5.50 per share.  The Company made an early interest

25 payment in the amount of approximately $3.7 million on the convertible notes to Dr. Adelson.  On

26 November 14, 2008, Dr. Adelson also purchased 5,250,000 shares of the Company's 10% Series A

27 Cumulative Perpetual Preferred Stock and warrants to purchase an aggregate of up to 87,500,175

28 shares of common stock at an exercise price of $6.00 per share.  In 2009, the Company paid Dr.

1   Adelson quarterly dividend payments on the preferred stock in the aggregate amount of $52.5

2   million.  Finally, the Company covered Dr. Adelson's legal fees in the aggregate amount of

3   approximately $499,650, "in connection with the convertible notes and the preferred stock and

4   warrant transactions."

5          59.    Aside from the slew of perquisite afforded defendant Adelson and his family

6   members, defendant Adelson is and has been a member of the Nominating and Governance

7   Committee since at least 2008, and therein, determined who served on the Board and what would be

8   the directors' remuneration.  In turn, defendant Adelson has used his unbound influence and power

9   over the Board, filled with his hand-picked stooges, to impose his will on the Company, and engage

10   it in a course of conduct that has exposed the Company to potential fines and sanctions arising from

11   violations of the FCPA.

12          60.    There is no better example of defendant Adelson's influence over the rest of the

13   Individual Defendants than the acrimonious "resignation" of former LVSC President and COO,

14   Weidner.  Beginning in or about 2008, LVSC felt the impact of the deteriorating global economy, as

15   shares fell tremendously from an all-time high of $148.76 on October 29, 2007, to $1.42 on March 9,

16   2009.  Among other disagreements, defendant Adelson and Weidner had engaged in a series of

17   disputes concerning when to raise additional capital in order to avoid breaching the maximum

18   leverage ratios set by LVSC's bank creditors.  Defendant Adelson's stubborn insistence on delaying

19   accessing the capital markets, against the advice of Weidner, forced the Company to resort to several

20   last-minute transactions to avoid bankruptcy, including a $1 billion influx of cash from defendant

21   Adelson, a follow-on offering of the Company's common stock, and halting construction on new

22   developments in Las Vegas, Pennsylvania, and Macau.

23          61.    Defendant Adelson's constant strife with senior management caused the Company to

24   appoint a special Executive Committee comprised of defendants Leven, Chafetz, and Siegel to

25   mediate disputes between defendant Adelson and senior management, including Weidner.  Among

26   the reasons for appointing the Executive Committee, the Company cited senior management's "loss

27   of confidence … in the management of the Company and [its] governance process."  The Company

28

described the role and reasons for the appointment of the Executive Committee as follows in its Form 10-Q filed November 10, 2008:

> On October 29, 2008, certain members of our management team, including Sheldon G. Adelson, Chairman of the Board and Chief Executive Officer, William P. Weidner, President and Chief Operating Officer, Bradley H. Stone, Executive Vice President, and Robert G. Goldstein, Senior Vice President (the "Senior Management Members"), recommended to our board of directors that it institute additional corporate policies and procedures. Upon such recommendation, our board of directors formed an executive committee (the "Executive Committee") comprised of Irwin Chafetz, Michael A. Leven and Irwin A. Siegel, with Mr. Leven being the Chairman of the Executive Committee. The role of the Executive Committee is to exercise the powers of the board of directors in between scheduled board meetings, including the power to resolve disagreements among management. Also, the board of directors gave Mr. Stone the additional responsibilities of President of Construction and Operations. ***The board of directors adopted these measures to address governance concerns raised by the Senior Management Members, address a number of outstanding differences between our Chief Executive Officer and other Senior Management Members and in response to a loss of confidence by certain Senior Management Members in the management of the Company and our governance process.***

The underlying purpose behind the creation of the Executive Committees became all too apparent as merely five months after its creation, the committee was dissolved following the ouster of defendant Adelson's nemesis, Weidner.  In fact, as detailed below, defendant Leven, who was charged with mediating disputes between Weidner and defendant Adelson as the Chairman of the Executive Committee, curiously replaced Weidner after his forced resignation.

62.    On March 8, 2009, after a bitter internal struggle with defendant Adelson over the operations of the Company, Weidner submitted his resignation from the Company. Unsurprisingly, in his resignation letter, Weidner acknowledged that he "has had, and continued to have, outstanding differences with the Chairman and [CEO] [referring to defendant Adelson] about the management of the Company."  Weidner's resignation came ***merely four days*** after two Board members met with him to inform him that the Company had decided to hire defendant Leven, a LVSC Board member and defendant Adelson's crony, in his place.  However, as detailed below, the other Board members were not consulted regarding Weidner's dismissal from his position in advance of this meeting with Weidner.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

63.     The next day, James Purcell ("Purcell"), a longtime LVSC Board member, submitted his resignation from the Board to the Company, citing his disagreement with the Board's process leading up to the termination of Weidner.  In his letter, Purcell specifically referenced the Company's failure to inform and consult with the rest of the Board members concerning Weidner's dismissal prior to meeting with Weidner to seek and negotiate his resignation.  Notably, Purcell stated, "[i]t, was in my judgment, wrong to engage in discussions with Weidner to request his resignation without a full and open discussion of the potential consequences of the series of actions that were planned. No business enterprise should undertake the significant actions that have been and are proposed to be *taken today without a full meeting of its Board*."  Responding to Weidner's "resignation," defendant Adelson claimed that Weidner's departure was not a loss for the Company, but "[j]ust the opposite." Defendant Adelson also noted that he's "always been in charge" of the Company and the Board. Defendant Adelson quieted any doubt as to his role in Weidner's departure, when he remarked, concerning the circumstances of Weidner's departure, that "[w]e just sort of helped [Weidner] out a little bit … [w]e helped him resign a little bit."

64.     As President and COO of LVSC, one of defendant Leven's first decisions was to hire Jacobs to head the Company's Macau operations, and later serve as CEO of its spin-off, SCL. Jacobs's later dismissal for the same reasons underlying Weidner's departure (disagreements with defendant Adelson) would shed light on the Company's pervasive and systemic violations of the FCPA and the Nevada gaming regulations.

**C.     LVSC's Violations of the FCPA and Nevada Gaming Regulations**

65.     LVSC's potential violation of applicable federal and state laws was first revealed on October 20, 2010, in a lawsuit filed by Jacobs against the Company, SCL, and unnamed defendants for breach of contract concerning his purported termination "for cause" on July 23, 2010.  The Jacobs Complaint detailed multiple violations of the FCPA committed by the Company under the direction and at the behest of defendant Adelson.  In particular, Jacobs claimed that defendant Adelson instructed him to: (i) use "improper leverage" against senior Macau governmental officials in order to obtain and sell strata-title of The Four Season Apartments in Macau; (ii) threaten to withhold business from Chinese banks unless they pressured senior Macau governmental officials to deliver

- 22 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

strata-title for The Four Seasons Apartments to LVSC, and give the Company "favorable treatment with regards to labor quotas and table limits"; (iii) conduct discrete investigation of senior Macau governmental officials in order to discover adverse information it could later use to influence the same officials for the benefit of LVSC; (iv) hire Alves, who was a local Macau attorney and also a Macau government official, as SCL's Legal Advisor notwithstanding apparent violations of the FCPA arising from Alves' position in the Macau government; and (v) refrain from disclosing material information to SCL's Board including the Company's involvement with the junket business led by the Triads.  Further, the Jacobs Complaint alleged that defendant Adelson sought to "aggressively grow the junket business within Macau" notwithstanding Jacobs' reservations about the junket business which were attributed to, among other things, "investigations by Reuters and other alleging LVSC involvement with Chinese organized groups, know as Triads, connected to the junket business."

66.    Jacobs' allegation concerning Alves is particularly surprising given Alves' extensive ties to, and various positions held in the Macau government.  As an administrative region of the PRC, Macau has great autonomy over its own affairs, and is run by the Chief Executive of Macau. The Executive Council serves as the government's top advisory body, assisting the Chief Executive in the administration of Macau's affairs, and in policymaking.  The Legislative Assembly is responsible for, among other things, enacting, amending, suspending, and repealing legislation, debating any issue concerning public interest, and debating the policy addresses by the Chief Executive.  Alves is a member of both the Executive Council and the Legislative Assembly, and is also Chairman of the Audit Committee for Macau's monetary authority.

67.    In September 2010, nearly two months after Jacobs' dismissal, SCL rehired Alves as its Legal Advisor.  In fact, Alves was previously employed by SCL for an 18-month period which ended acrimoniously for unexplained reasons in February 2010.  Amazingly, in a Macau Daily Times article dated September 19, 2010, defendant Leven confirmed that Alves had been continuously advising SCL throughout the year, and negotiations for Alves to rejoin SCL were ongoing: ***"He was a close advisor of [SCL] throughout the last year and we would be very interested in having him back."***  The impropriety in Alves' involvement and extended negotiation with SCL is further

exacerbated by the fact that LVSC was actively seeking concessions from the Macau government to sell strata-title ownership of the Four Seasons Apartments in the Cotai Strip during that time. In the same article detailed above, defendant Leven acknowledged the potential improprieties apparent in Alves' relationship and negotiation with SCL, stating, "[w]hen we deal with an individual that is a Government official – Alves is also a member of the Executive Council, an advising body to the local government – we have to follow the rules of the U.S."

68.    On March 1, 2011, LVSC filed with the SEC its annual report on Form 10-K for the period ended December 31, 2010. In its Form10-K, the Company disclosed that it was under investigation by the SEC and the DOJ for possible violation of the FCPA. The Company also announced that it believed the investigations were caused by the allegations made in a suit filed by the former CEO of SCL, Jacobs. The filing stated in pertinent part:

> On February 9, 2011, LVSC received a subpoena from the Securities and Exchange Commission requesting that the Company produce documents relating to its compliance with the Foreign Corrupt Practices Act. The Company has also been advised by the Department of Justice that it is conducting a similar investigation. It is the Company's belief that the subpoena may have emanated from allegations contained in the lawsuit filed by Steven C. Jacobs described above. The Company intends to cooperate with the investigations.

69.    LVSC further disclosed in the Form 10-K that the resolution of the FCPA investigations could have a material, adverse impact on its business. For example, the Company stated: "[a]ny determination that [the Company has] violated the FCPA could have a material adverse effect on [its] financial condition." On this news, LVSC's market capitalization fell by over $2.1 billion, or 6.3% in a single day on March 1, 2011.

70.    The significance of the Company's business ventures in Macau to its overall revenues, and the fact that the allegations indicate express directives from LVSC's controlling shareholder, top executive, and Chairman to violate FCPA's anti-bribery provisions, serve as further evidence that the Individual Defendants failed to implement and/or maintain adequate internal controls to ensure compliance with the FCPA. Indeed, in fiscal 2010, when the FCPA violations allegedly occurred, Macau operations accounted for approximately 61.5% of LVSC's total net revenue, or $4.2 billion.

Consequently, any adverse findings pursuant to the SEC and DOJ investigations regarding its business in Macau would have an enormous impact on the Company's future business prospects.

71.     Under the FCPA, federal authorities may impose a broad range of civil and criminal sanctions on issuers of U.S. registered securities.  The DOJ and SEC have entered into agreements with, and have obtained a range of sanctions against, several public corporations.  The results of these actions can be dire.  For example, in late 2008, Siemens AG paid $800 million to settle charges that it had inadequate internal controls under the FCPA.  In early 2009, Halliburton Company paid $559 million to settle charges that it bribed Nigerian officials during the construction of a gas liquefaction facility.  And, in early 2010, Daimler AG paid $93.6 million and entered into a deferred prosecution agreement to resolve charges that it conspired to violate the books and records provisions of the FCPA.  As for LVSC, the Company disclosed that it "intends to cooperate with the [SEC and DOJ] investigations."  According to Leven, the investigation may take several years and involve "a voluminous amount of information, [that] go back probably five year at least."  In addition to the FCPA allegations in the Jacobs Complaint, the SEC subpoena also involved LVSC and SCL's involvement with the Triads, a notorious organized crime syndicate in China.

72.     The extent of the scrutiny surrounding LVSC is not limited to the SEC and DOJ investigations, but further extends to investigations surrounding LVSC's purported ties to Chinese organized crime.  On March 2, 2011, *The Wall Street Journal* reported that the NGCB has opened its own probe of the Company concerning the allegations made in the Jacobs Complaint, including allegations involving the Company's association with the Triads.  As a Nevada gaming corporation, LVSC is subject to the gaming laws of the state which prohibits "unsuitable" associations that "reflect or tend to reflect discredit [or disrepute] upon the State of Nevada or the gaming industry."  Adverse findings pursuant to NGCB's investigation could lead to fines and sanctions on the Company's Las Vegas operations as well.

73.     On March 11, 2011, Reuters published an article entitled "Special Report: Macau Connection," which revealed yet another government agency investigating the Company in connection with the Jacobs allegations, as well as potential ties between LVSC and organized crime in China.  Among other things, it was reported in the Reuters article that the FBI had initiated an

investigation of the Company "prompted by the Jacobs allegations."  The FBI investigation adds to an ever growing list of agencies looking into the Company's violations of the FCPA arising from the Jacobs Complaint including allegations of the Company's ties to the Triads.   According to the Reuters article, the Company had commissioned background reports on two individuals with ties to the Triads, including Cheung, who reportedly was in charge of running the junket rooms at the Sands Macao.  The article stated:

> SANDS: RETURN OR DESTROY DOCUMENTS
>
> According to the Jacobs suit, Sands has already done its own poking around within Macau's criminal underworld. The casino commissioned background checks on local officials as well as two alleged criminals.
>
> Sands has given at least one report to Nevada, a casino regulatory source said, but it has gone out of its way to stop the reports from reaching the public eye.
>
> Last year, Reuters published a report on a man named Cheung Chi-tai, described in court testimony as the mastermind behind a plot to murder a dealer suspected of cheating.
>
> At trial a witness identified Cheung as a leader of the Wo Hop To -- one of the largest triads in Hong Kong.
>
> ***Cheung was also, according to witness testimony, "the person in charge" of a VIP room at the Sands Macao***, and Hong Kong stock exchange filings showed him to be a "substantial shareholder" in a junket company with ties to the cloistered room.
>
> The allegations emerged in a routine trial, barely noted beyond the crime pages of Hong Kong newspapers. Yet the revelations were historic: this was one of the first documented examples of an alleged criminal figure financially linked to a U.S.-based, publicly traded casino.
>
> The article led to an ongoing Nevada investigation. The company then commissioned its own private background report on Cheung, said a person involved in the Sands effort who requested anonymity.
>
> ***The company also ordered a report, according to documents in the Jacobs case, on another figure who was identified as a member of a triad*** in a 1992 U.S. Senate Subcommittee probe. Charles Heung was described in a Subcommittee chart of organized crime as an officer of the Sun Yee On triad.
>
> In a 2007 public hearing, the former chair of the Nevada Gaming Control Board, Randy Sayre, also said he had seen three public documents identifying Heung as "a high-ranking member of the triads," according to a transcript.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Heung has repeatedly denied any participation in organized crime.

The Sands background reports on Cheung and Heung are the subject of a series of letters in the Jacobs case. Documents show the former executive still holds copies of at least one of the reports based on the investigations commissioned by the casino.

Sands' displeasure is reflected in its legal team's demand for the "immediate" return of the internal inquiries.

"All copies," the attorneys insisted, should "be returned to us or destroyed."

74.     As the article details, the junket system ran by the Triads have been incredibly profitable for Macau casinos:

The source of this criminal expansion is ***Macau's unique junket system, which whisks VIPs into casinos, stakes them, and offers legally suspect services to avoid China's strict currency and debt collection laws***. The junket companies -- widely linked to the triads, according to diplomatic cables -- generated an incredible 72 percent of the region's gaming revenues last year.

"Casino operators regret the growing power of 'junket' operators in mainland China that account for most of the Macau casinos' earnings," one U.S. consulate official reported in a cable. "They believe the operators are directly or indirectly involved with organized crime in Macau and the mainland."

The U.S. casinos operating in Macau are bound by Nevada laws that prohibit them from bringing "disrepute" upon the state. But they have immersed themselves in the junkets -- while privately, according to cables, confiding their concerns about the criminality of the industry to diplomats.

Another cable quoted a senior U.S. executive saying the growth of the triads was leading to expanding corruption in China. Provincial officials were providing "sweetheart" land sales, business licenses, and government contracts to junket operators, in exchange for bank deposits or cash sums paid to the officials upon arrival in Macau.

75.     Worse, as defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel disclosed in their Form 10-K, they knew that an association with "unsavory and unsuitable" organizations would be in direct violation of the Nevada gaming regulations and subject the Company to revocation of its gaming license:

The ownership and operation of casino gaming facilities in the State of Nevada are subject to the Nevada Gaming Control Act and the regulations promulgated thereunder (collectively, the "Nevada Act") and various local regulations. Our gaming operations are also subject to the licensing and regulatory control of the

Nevada Gaming Commission (the "Nevada Commission"), the Nevada Gaming Control Board (the "Nevada Board") and the Clark County Liquor and Gaming Licensing Board (the "CCLGLB" and together with the Nevada Commission and the Nevada Board, the "Nevada Gaming Authorities").

The laws, regulations and supervisory procedures of the Nevada Gaming Authorities are based upon declarations of public policy that are concerned with, among other things:

- the *prevention of unsavory or unsuitable persons from having a direct or indirect involvement with gaming at any time or in any capacity*;

* * *

*The loss of our gaming license or our failure to comply with the extensive regulations that govern our operations in any jurisdiction where we operate could have an adverse effect on our financial condition, results of operations or cash flows.*

Our gaming operations and the ownership of our securities are subject to extensive regulation by the Nevada Commission, the Nevada Board and the CCLGLB. The Nevada Gaming Authorities have broad authority with respect to licensing and registration of our business entities and individuals investing in or otherwise involved with us.

Although we currently are registered with, and LVSLLC and VCR currently hold gaming licenses issued by, *the Nevada Gaming Authorities, these authorities may, among other things, revoke the gaming license of any corporate entity or the registration of a registered corporation or any entity registered as a holding company of a corporate licensee for violations of gaming regulations*.

In addition, the Nevada Gaming Authorities may, under certain conditions, revoke the license or finding of suitability of any officer, director, controlling person, stockholder, noteholder or key employee of a licensed or registered entity. If our gaming licenses were revoked for any reason, the Nevada Gaming Authorities could require the closing of the casinos, which would have a material adverse effect on our business. In addition, compliance costs associated with gaming laws, regulations or licenses are significant. Any change in the laws, regulations or licenses applicable to our business or gaming licenses could require us to make substantial expenditures or could otherwise have a material adverse effect on our financial condition, results of operations or cash flows.

A similar dynamic exists in all jurisdictions where we operate and a regulatory action against one of our operating entities in any gaming jurisdiction could impact our operations in other gaming jurisdictions where we do business. For a more complete description of the gaming regulatory requirements that have an effect on our business, see "Item 1 — Business — Regulation and Licensing."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

According to the Reuters article and as the Individual Defendants admit in their filings, the Company's purported ties to organized crime in Macau may potentially lead to the NGCB revoking or indefinitely suspending the Company's gaming licenses.

## DAMAGES

76.     As reflected in the Company's over $4.4 billion decline in market capitalization from a share price high on November 8, 2010; to when the Company revealed it was subject to SEC and DOJ investigation on March 1, 2011, LVSC has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.  Further, as a direct and proximate result of the Individual Defendants' misconduct, LVSC has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from cooperating with SEC, DOJ, NGCB, and FBI investigations, including complying with subpoena requests, and other production of materials;

(b)     costs incurred from any internal review or investigation of violations of federal and state laws;

(c)     costs incurred from the compensation and benefits paid to Individual Defendants who breached their fiduciary duties to the Company;

(d)     amounts paid to foreign officials in violation of the FCPA;

(e)     any potential fines, sanctions, and disciplinary actions taken against the Company as a result of the Company's violations of the FCPA and state gaming regulations; and

(f)     the cost of the potential settlements with the SEC, DOJ, NGCB, FBI, and any other regulatory or executive agency.

77.     In addition, LVSC's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.

78.     Moreover, these actions have irreparably damaged LVSC's corporate image and goodwill.  For at least the foreseeable future, LVSC will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that LVSC's ability to raise equity capital or debt on favorable terms in the future is now impaired.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

79.     Plaintiff brings this action derivatively in the right and for the benefit of LVSC to redress injuries suffered, and to be suffered, by LVSC as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.  LVSC is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

80.     Plaintiff was a shareholder of LVSC at the time of the wrongs complained, has continuously been a shareholder since that time, and is a current LVSC shareholder.

81.     Plaintiff will adequately and fairly represent the interests of LVSC in enforcing and prosecuting its rights.

82.     The current Board of LVSC consists of the following eight individuals: defendant Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel.  Plaintiff has not made any demand on the Board because such a demand would be a futile and useless act, particularly for the reasons stated below.

**Demand Is Excused as to Defendant Adelson Because He Faces a Substantial Likelihood of Liability**

83.     Demand is futile as to defendant Adelson because he directly authorized a campaign to use "improper leverage," and other illicit means of inducement against Macau officials to obtain favorable business results for the Company. Further, he explicitly directed the Company to pursue its junket business associated with the Triads in contravention of the Nevada gaming regulations. Indeed, he is explicitly named in the Jacobs Complaint as the driving force behind the Company's issues with the FCPA and the Nevada gaming regulations.  As the CEO, Chairman, and controlling shareholder of the Company, defendant Adelson had the utmost duty and responsibility to ensure that the Company implement and maintain adequate internal controls to ensure compliance with the FCPA and state gaming regulations.  Instead, in a direct breach and dereliction of his fiduciary duties, defendant Adelson consciously and purposefully engaged in misconduct that has exposed the Company to severe scrutiny by the SEC, DOJ, NGCB, and FBI.  Because defendant Adelson faces a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    substantial likelihood of liability for breaching his fiduciary duty of loyalty, demand upon him is

2    futile.

3    **Demand Is Excused as to Defendants Leven, Chafetz, and Forman Because They Are**
     **Dominated and Controlled by Defendant Adelson**

4

5           84.     As the Company's Proxy statement filed April 23, 2010, candidly admits, defendants

6    Leven, Chafetz, and Forman are not independent directors.  This, standing alone, is sufficient to find

7    demand futile as to the above Board members.  Nevertheless, demand upon defendants Leven,

8    Chafetz, and Forman are also futile for the reasons delineated below.

9           85.     Aside from his position as a director of LVSC, defendant Leven is also LVSC's

10   President and COO and has been since March 2009.  Further, defendant Leven is currently SCL's

11   acting CEO and has been since July 2010, when Jacobs was terminated.  Hence, defendant Leven is

12   beholden to defendant Adelson who owns a controlling share of LVSC, and sits as the Chairman of

13   the Company, as well as its subsidiary SCL, from which defendant Leven receives millions of dollars

14   in compensation.  Because a substantial portion of defendant Leven's compensation and livelihood is

15   inextricably tied to his position in entities controlled by defendant Adelson, defendant Leven is

16   hopelessly conflicted and incapable of exercising independent and disinterested judgment as to any

17   demand.  Hence, demand is futile as to defendant Leven.

18          86.     Defendant Chafetz is similarly beholden to defendant Adelson due to his current

19   position and his principal occupation in an entity controlled by defendant Adelson.  Defendant

20   Chafetz is currently a manager of The Interface Group, LLC ("The Interface Group"), an entity

21   controlled by defendant Adelson.  Accordingly, defendant Chafetz relies on defendant Adelson for

22   his continued employment and substantial compensation, and consequently, cannot independently

23   consider a demand against defendant Adelson.

24          87.     In addition, defendant Chafetz and defendant Adelson have prior professional and

25   personal relationships that render defendant Chafetz unable to fairly and independently evaluate any

26   demand.  From 1989 to 1995, defendant Chafetz was a stockholder, vice president, and director of

27   The Interface Group, and reported to defendant Adelson who was the President and Chairman of The

28   Interface Group.  Further, from 1984 to 1990, defendant Chafetz was the President of Five Star

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Aircraft/Airlines ("Five Star"), a division of The Interface Group.  As the President of Five Star, defendant Chafetz again reported to defendant Adelson during his tenure there.  Also, various public media outlets including the *New York Times* have published articles corroborating the close personal relationship between defendant Chafetz and defendant Adelson.  A *New York Times* article from January 17, 2008, described defendant Chafetz as a "former business partner who has known Mr. Adelson since grade school."  Another publication reported that defendant Chafetz is a "lifelong friend of Mr. Adelson," and they together started a charter tours business as early as in the 1960s.  In fact, defendant Chafetz and defendant Adelson are so close that defendant Chafetz serves as the trustee of several trusts for the benefit of defendant Adelson's family members.  As such, defendant Adelson exerts considerable influence over defendant Chafetz arising from defendant Chafetz's well-documented and extensive history of positions held under defendant Adelson, and their personal relationship that span over fifty years.  Accordingly, any demand on defendant Chafetz is futile.

88.     Defendant Forman is not independent and disinterested.  Like defendant Chafetz, defendant Adelson exercises control over the employment and compensation of defendant Forman.  From 1989 to 1995, defendant Forman was the Vice President and Legal Advisor of The Interface Group, an entity controlled by defendant Adelson.  Further, defendant Forman served as an officer of both Interface Group-Massachusetts Inc., and Interface Group-Nevada, Inc., both controlled by defendant Adelson from 1989 to 1995.  Hence, defendant Forman's past, present, and future business prospects and livelihood depend on defendant Adelson and their continued relationship.  Accordingly, defendant Forman cannot render independent or disinterested judgment as to any demand against defendant Adelson, and demand on him is futile.

89.     Defendants Chafetz and Forman also have considerable philanthropic ties to defendant Adelson that impair their ability to evaluate a demand independently and in a disinterested fashion.  Defendant Chafetz is the Chair of a non-profit organization, Campaign for Hebrew SeniorLife and a Trustee of SeniorLife, that is currently developing a multi-generational community in Dedham, Massachusetts.  Defendant Adelson has donated heavily to this organization.  In fact, defendant Adelson has been such a generous donor to defendant Chafetz's organization that it has decided to name its Dedham campus after defendant Adelson.  Likewise, defendant Forman was the

overseer of the Beth Israel Deaconess Medical Center ("BIDMC"), which defendant Adelson pledged $2.25 million to in support of its new radiation therapy system.  As a result of defendant Adelson's significant contributions to organizations and entities managed by defendants Chafetz and Forman, they cannot possibly evaluate independently and in a disinterested manner any potential demand to institute litigation against defendant Adelson.  Demand is futile as to defendants Chafetz and Forman for all the foregoing reasons.

**Demand Is Excused as to Defendants Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel Because They Are Dominated and Controlled by Defendant Adelson**

90.     Demand is futile as to defendants Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel because defendant Adelson, as controlling shareholder of the Board, hand-selects the Company's directors.  Indeed, defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel admitted as much in their most recent Form 10-K filed March 1, 2011:

> *The interests of our principal stockholder in our business may be different from yours.*
>
> Mr. Adelson, his family members and trusts established for the benefit of Mr. Adelson and/or his family members beneficially own (excluding unexercised warrants to purchase 87.5 million shares of our common stock) approximately 49% of our outstanding common stock as of December 31, 2010.  Accordingly, *Mr. Adelson exercises significant influence over our business policies and affairs, including the composition of our Board of Directors and any action requiring the approval of our stockholders*, including the adoption of amendments to our articles of incorporation and the approval of a merger or sale of substantially all of our assets. *The concentration of ownership may also delay, defer or even prevent a change in control of our company and may make some transactions more difficult or impossible without the support of Mr. Adelson*.  The interests of Mr. Adelson may conflict with your interests.

91.     In the aggregate, defendant Adelson currently controls 46.2% of the voting power of the Company, and holds considerable influence over whether each Board member will retain his seat on the Board in the next Board election.  Defendant Adelson's domination and control over the Board is further demonstrated by the fact that in less than three years, he caused the Company to inexplicably force the resignation of its President and COO, Weidner, and caused SCL to terminate its CEO, Jacobs, for questioning his operation of the Company, and/or refusing to execute his unlawful directives.  In fact, during Jacobs's tenure, the Company exponentially increased its market

- 33 -

capitalization from $1.1 billion to over $19 billion.  Yet, defendant Adelson still exerted his unbound

influence over defendants Leven, Siegel, and Schwartz, who are all members of the SCL Board, to

terminate Jacobs "for cause," because Jacobs refused his demand to engage in a course of conduct

that was in violation of the federal and state laws and regulations.  As such, defendants Ader, Leven,

Chafetz, Forman, Koo, Schwartz, and Siegel cannot act independently because they are beholden to

defendant Adelson for their lucrative compensation they received as directors/officers, as described

below:

| | Year | Salary | Fees Paid in Cash | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| Ader | 2009 | | $50,517 | | $50,000 | $100,000 | | $200,517 |
| Leven | 2009 | $1,561,539 | | $202,740 | | $2,400,000 | $229,454 | $4,393,733 |
| Chafetz | 2009 | | $83,776 | | $50,000 | | | $133,776 |
| Forman | 2009 | | $75,000 | | $50,000 | | | $125,000 |
| Koo | 2009 | | $66,000 | | $50,000 | | | $116,000 |
| Schwartz | 2009 | | $54,389 | | $50,000 | $100,000 | | $204,389 |
| Siegel | 2009 | | $106,526 | | $50,000 | | | $156,526 |

Accordingly, demand is futile as to defendants Ader, Leven, Chafetz, Forman, Koo, Schwartz, and

Siegel because they are not independent.

**Demand Is Excused as to Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel Because They Face a Substantial Likelihood of Liability**

92.     Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel as

members of the Board, were and are subject to the Code.  The Code went well beyond the basic

fiduciary duties required by applicable laws, rules, and regulations.  The Code required that

defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel maintain the integrity

of the Company and explicitly mandated that all Covered Persons, including directors, comply with

the FCPA and other applicable laws and regulations.  Defendants Adelson, Ader, Leven, Chafetz,

Forman, Koo, Schwartz, and Siegel failed to do this which violated the Code.  Because defendants

Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel violated the Code and failed to

maintain the Company's reputation, they face a substantial likelihood of liability for breaching their

fiduciary duties, and demand upon them is futile.

93.     Defendants Ader, Schwartz, and Siegel were members of the Audit Committee.  As members of the Audit Committee during the relevant period, these Audit Committee Defendants had additional and heightened responsibility to oversee the Company's compliance with legal and regulatory requirements.  Specifically, the Audit Committee Defendants had a duty and responsibility to review "the adequacy of the Company's internal controls and its procedures designed to ensure compliance with laws and regulations and any special audit steps adopted in light of material control deficiencies."  Thus, the Audit Committee Defendants were responsible for ensuring that the Company had an adequate system of internal controls in place to prevent the FCPA and state regulatory violations alleged herein.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they knowingly and recklessly failed to ensure such internal controls were in place, and allowed defendant Adelson to exercise unbound discretion and exert personal autonomy over the operations of the Company, which resulted in the Company incurring heavy scrutiny for the violations described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

94.     Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel breached their fiduciary duty of loyalty by failing to implement and maintain an adequate system of internal controls to prevent the violation of the FCPA and state gaming regulations.  As demonstrated by defendant Adelson's directives for the Company to engage in a series of misconduct in direct violation of the FCPA's anti-bribery provisions and Nevada gaming regulations, the Company did not have in place, and/or failed to properly implement, an effective system of internal controls to check defendant Adelson's unfettered control over the Company.  These defendants failure to maintain a system of internal controls to prevent a violation of applicable federal and state laws and regulations is further reinforced by SCL's ongoing negotiations with Executive Council and Legislative Assembly member, Alves, and his ultimate employment with the Company's subsidiary while the Company's application for certain government concessions were pending before the Macau government.  Accordingly, defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and

Siegel breached their fiduciary duties in failing to implement and maintain such internal controls, and face a substantial likelihood of liability. Demand upon them is futile.

95. To properly prosecute this lawsuit, defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel would have to sue themselves, requiring them to expose themselves to tens of millions of dollars in civil liability and/or sanctions. This they will not do. Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel are exposed to potential liability for operating LVSC without the internal controls for compliance with the FCPA and state gaming laws that would have detected and prevented the improper inducements that appear to have occurred in Macau over an extended period of time, and cease the Company's ongoing junket business operated and associated with Chinese organized crime. Thus, demand on defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel is futile, and therefore, excused.

96. Defendants Adelson, Leven, Schwartz, and Siegel were members of the SCL Board, which provided them with knowledge of the Company's Macau operations, including negotiating with Macau officials to obtain strata-title for The Four Seasons Apartments, addressing local regulatory concerns that could potentially affect SCL business, and executive employment decision such as hiring SCL's Legal Advisor. Defendants Adelson, Leven, Schwartz, and Siegel breached their duty of loyalty to SCL by knowingly, recklessly, or with gross negligence allowing SCL to engage in conduct that violated the FCPA and Nevada gaming regulations. In particular, as explained above, defendants Adelson, Leven, Schwartz, and Siegel directed SCL to improperly induce Macau officials to obtain favorable business results for both SCL and LVSC, and instructed SCL to hire Alves as its Legal Advisor, although Alves' position with the Macau government posed a serious risk of non-compliance with the FCPA and Nevada gaming regulations. Defendant Adelson's directives, and defendants Leven, Schwartz, and Siegel's authorization and execution of such directives, were in contravention of the FCPA and Nevada gaming regulations, and they authorized the eventual hiring of Alves as SCL's Legal Advisor notwithstanding the FCPA implications of his hiring. As such, because defendants Adelson, Leven, Schwartz, and Siegel face a substantial likelihood of liability for their breach of fiduciary duties to SCL, demand is futile upon them.

97.     Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel as members of the Board, have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  Likewise, defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel have received and will continue to receive substantial compensation predicated upon LVSC's results in Macau.  The acts complained of herein have resulted in economic benefits to LVSC (as well as to these defendants through their increased and continuing compensation) without corresponding recognition or accounting for the correlated liability and risk that LVSC was subject to as a result of these schemes.  Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation once the risk is accounted for and the penalties and costs are reconciled into LVSC's balance sheet.  Thus, demand on defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel is futile, and therefore, excused.

98.     If defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel are protected against personal liability for their acts of mismanagement and breach of fiduciary duties alleged in this Complaint by officers' and directors' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of LVSC.  However, the officers' and directors' liability insurance policies covering defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel in this case contain provisions that eliminate coverage for any action brought directly by LVSC against the defendants, known as the "insured versus insured exclusion."  As a result, if the Board were to cause LVSC to sue themselves or certain of the officers of LVSC, there would be no officers' and directors' insurance protection and thus, this is a further reason why defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance, then defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel will

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  not cause LVSC to sue themselves, since they will face a large uninsured liability and lose the ability
2  to recover for the Company from the insurance.

3      99.    LVSC has been and will continue to be exposed to significant losses due to the
4  wrongdoing complained of herein, yet LVSC's Board has not filed any lawsuits against defendants or
5  others who were responsible for the wrongful conduct to attempt to recover for LVSC any part of the
6  damages LVSC suffered and will suffer thereby.  Thus, demand on the Board is futile, and therefore,
7  excused.

8      100.   Moreover, despite the Board having knowledge of the claims and causes of action
9  raised by plaintiff, the current Board has failed and refused to seek to recover for LVSC for any of
10  the wrongdoing alleged by plaintiff herein.

11     101.   Plaintiff has not made any demand on the other shareholders of LVSC to institute this
12  action since such demand would be a futile and useless act for at least the following reasons:

13      (a)    LVSC is a publicly held company with over 726 million shares outstanding as
14  of February 18, 2011, and thousands of shareholders;

15      (b)    making demand on such a number of shareholders would be impossible for
16  plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

17      (c)    making demand on all shareholders would force plaintiff to incur excessive
18  expenses, assuming all shareholders could be individually identified.

19                  **COUNT I**
20     **Against All Individual Defendants for Breach of Fiduciary Duty**

21     102.   Plaintiff incorporates by reference and realleges each and every allegation set forth
22  above, as though fully set forth herein.

23     103.   As alleged in detail herein, the Individual Defendants, by reason of their positions as
24  officers and directors of LVSC, and because of their ability to control the business and corporate
25  affairs of LVSC, owed LVSC fiduciary obligations of due care and loyalty, and were and are
26  required to use their utmost ability to control and manage LVSC in a fair, just, honest, and equitable
27  manner.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

104.     Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, Siegel, and Chao as directors of the Company, owed LVSC the highest duty of loyalty. Defendant Adelson as an officer of LVSC, owed the Company fiduciary duties of care and loyalty.  These defendants breached their duty of loyalty and care by knowingly or recklessly allowing the Company to violate the FCPA and state gaming regulations, and failing to conduct its business and operations without establishing and maintaining a system of internal controls in compliance with the applicable laws.

105.     As a direct and proximate result of defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, Siegel, and Chao's foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

106.     Plaintiff, on behalf of LVSC, has no adequate remedy at law.

## COUNT II

### Against All Individual Defendants for Waste of Corporate Assets

107.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.     As a result of the misconduct described above, defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, Siegel, and Chao wasted corporate assets by: (i) providing monetary benefits to foreign officials and individuals; (ii) by failing to properly consider the interests of the Company and its public shareholders; (iii) by failing to conduct proper supervision; (iv) by paying bonuses to themselves; and (v) by causing the Company to incur millions of dollars of legal liability and/or legal costs to defend their unlawful actions and cooperate with pending government investigations.

109.     As a result of the waste of corporate assets, defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, Siegel, and Chao are liable to the Company.

110.     Plaintiff, on behalf of LVSC, has no adequate remedy at law.

## COUNT III

### Against All Individual Defendants for Unjust Enrichment

111.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

- 39 -

112.    By their wrongful acts and omissions, defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, Siegel, and Chao were unjustly enriched at the expense of and to the detriment of LVSC.  Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, Siegel, and Chao were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to LVSC.

113.    Plaintiff, as a shareholder and representative of LVSC, seeks restitution from defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, Siegel, and Chao, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants from their wrongful conduct and fiduciary breaches.

114.    Plaintiff, on behalf of LVSC, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of LVSC, demands judgment as follows:

A.    Against defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, Siegel, and Chao and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing LVSC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect LVSC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Company's internal controls as to its compliance with applicable federal, state, and foreign laws and regulations, including the FCPA and Nevada gaming regulations;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

1            3.     a provision prohibiting transactions between the Company and it executives;

2            4.     a provision to permit the shareholders of LVSC to nominate at least three

3    candidates for election to the Board; and

4            5.     a proposal to strengthen LVSC's oversight of its foreign operations and

5    relationship with foreign government officials, including its operations in Macau;

6         C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity ,and state

7    statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

8    on, or otherwise restricting the proceeds of defendants' trading activities or his other assets so as to

9    assure that plaintiff on behalf of LVSC has an effective remedy;

10        D.     Awarding to LVSC restitution from defendants and ordering disgorgement of all

11   profits, benefits, and other compensation obtained by defendants;

12        E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable

13   attorneys' fees, accountants' and experts' fees, costs, and expenses; and

14        F.     Granting such other and further relief as the Court deems just and proper.

15                                            **JURY DEMAND**

16        Plaintiff demands a trial by jury.

17   DATED: April 22, 2011                    LEVERTY & ASSOCIATES LAW CHTD

18

19                                            PATRICK R. LEVERTY

20                                    832 Willow St
                                    Willow, NV 89502
21                                  Telephone: 775-322-6636
                                    Facsimile: 775-322-3953
22

23                                  ROBBINS UMEDA, LLP
                                    BRIAN J. ROBBINS
                                    FELIPE J. ARROYO
24                                  SHANE P. SANDERS
                                    600 B Street, Suite 1900
25                                  San Diego, CA 92101
                                    Telephone: (619) 525-3990
26                                  Facsimile:  (619) 525-3991

27                                  Counsel for Plaintiff
     587221
28

                                           - 41 -

<u>VERIFICATION</u>

I, John Zaremba, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:


Dated: _4-21-11_____

_____
                    JOHN ZAREMBA